# EXHIBIT C

10/11/16

Dear Mrs. Lundy,

This report summarizes the expert opinions I have formed in Dausch v. Espino et al.  My report is based on my review of the documents listed below, which includes, among other documents, medical records from the State of Florida Department of Corrections and Indiana Department of Corrections.

I am board certified in both Infectious Diseases and Internal Medicine.  I completed my undergraduate studies at Tufts University in 1993.  I completed my medical school training at Rush University in Chicago in 1999.  I completed my medical residency training at the University of Pittsburgh Medical Center in 2002.  I completed my fellowship specialty training in Infectious Diseases at Rush University in Chicago in 2004.  Since then, I have been a full-time practicing Infectious Diseases/Internal Medicine attending physician at the Cook County Jail in Chicago, with additional privileges at the John H. Stroger Hospital and the Ruth M. Rothstein CORE Center.  I am also a voluntary Clinical Assistant Professor of Family Medicine at the University of Illinois School of Medicine, Assistant Professor for the Infectious Diseases Fellowship at Rush University, and a Certified Correctional Healthcare Professional.

The Cook County Jail is one of the largest single site urban correctional facilities in the United States, with a capacity of approximately 9,000 detainees.  Our daily census varies from 8,000 to 11,000 detainees.  In addition to my primary duties as the on-site infectious diseases specialist, I have also worked in every unit on the compound including all men's and women's general population (all security levels including

EXHIBIT "C"

1

maximum), infirmary units, mental health units, emergency room, intake facility, specialty clinic areas, and the women's day reporting program. I have experience with nearly every aspect of jail healthcare from frontline clinical duties to Physician Chair of the Infection Control Department to development of policies and procedures. I also act as faculty for the Department of Corrections Sheriff's Academy training on a weekly basis and am familiar with many of the interagency policies and procedures. As the Director of Infection Control, I am responsible for maintaining and updating facility policies on contagious diseases including containment in outbreaks, clinical management of select infections, reporting to health agencies, sanitation and environmental hygiene. I am also a co-principal investigator or otherwise responsible for multiple research protocols and service grants. Additionally, I am a primary liaison between the Cook County Jail and various public health agencies including the Chicago Department of Public Health and Illinois Department of Public Health.

In my Infectious Diseases/HIV clinics at the jail and CORE Center, I not only provide assessment and management of an array of infectious diseases, I also manage or co-manage other primary medical and psychiatric/psychological concerns. Nearly 80% of my patients have a documented chemical dependency problem, and more than 60% have a primary psychiatric diagnosis. Many more have personality disorders or other abnormal behavioral traits. I personally diagnose and prescribe treatment for many of these mental health concerns.

At the Ruth M. Rothstein CORE Center I act as the director of the Continuity of Care clinic for HIV+ returning citizens. Our facility serves over 6,000 under or uninsured members of the Cook County community. My clinic is exclusively for those

2

HIV+ men, women, and transgender recently released from either the Cook County Jail or from any of the Illinois Department of Corrections facilities statewide.

At the John H. Stroger Hospital I rotate twice yearly for two weeks each service block as one of the HIV inpatient ward attending physicians. I supervise a team of 2 residents, 2 interns, 1 physicians' assistant, and a clinical pharmacist. In this setting we care for patients with a variety of conditions requiring hospitalization including infectious diseases, other chronic medical/social conditions, cancer, cardiac care, diabetes, lung disease, autoimmune disorders, mental health issues, homelessness, dementia, neurologic conditions, skin problems, substance abuse/withdrawal and others.

Given my training and experience outlined above, I am familiar with the standard of care that should be applied by healthcare providers in a correctional facility under the circumstances presented in this case.

Please refer to the attached CV for a listing of professional publications and presentations.

During the previous four years I have testified as an expert witness at deposition in the following matters:  USDC Northern District of TX, 3:11-CV-0527K, USDC Eastern District of MI, 11-cv-10942, USDC Western District of MI, Southern Division, 4:92-CV-110, and USDC Eastern District of WI, 13-CV-1318.  I have testified as an expert at trial twice in the past four years: 3:11-CV-0527K and 4:92-CV-110.

I am being compensated for this case at a rate of $400.00/hr. for review of records, report generation, and portal-to-portal travel time. In the event of deposition, I will be compensated at a rate of $500.00/hr. plus travel time and related expenses. In the

event of trial testimony, I will be compensated at a rate of $5000.00/day plus travel time and related expenses. To date, I have billed for 7.5 hours of work.

I have reviewed the following documents related to the above-referenced litigation with regards to the allegations and issues alleged in the Plaintiffs' Complaint:

A. State of Florida Department of Corrections Medical Records

B. State of Indiana Department of Corrections Medical Records

This opinion letter represents my review of the associated medical records and other documentation provided and listed above. All opinions are based on my medical training, experience, and literature reviews. All opinions are to a reasonable degree of medical probability/certainty. I have never had an expert opinion disqualified.

I was asked to review the associated records outlined above to render an opinion about the medical care provided to Carl Dausch by Dr. G.A. Espino during his incarceration in the Florida Department of Corrections from approximately June 2012 until his transfer to the Indiana Department of Corrections on approximately July 2014.

## SUMMARY OF FLORIDA DEPARTMENT OF CORRECTIONS MEDICAL RECORDS

Mr. Dausch is a 58 year old male with a past medical history notable for hepatitis C, immunity to hepatitis B, hypertension, cocaine abuse, obesity, and longstanding

4

chronic bilateral shoulder problems including: rotator cuff tears, biceps tendon tears, and a history of prior bilateral shoulder rotator cuff surgeries in the past. The records are unclear, with dates of prior surgeries ranging from 2006 to 2009. His mental health history is unclear as he repeatedly refused to permit mental health evaluations (there are at least 12 unsigned refusal forms, all witnessed by other providers, and another 6 encounters where he simply declined without refusing). The limited number of in-person mental health evaluations permitted by Mr. Dausch did not indicate any signs of significant mental or emotional impairment.

On July 11, 2012, Dr. Espino evaluated Mr. Dausch. He reported chronic right shoulder pain and a prior right shoulder surgery in 2009. His pain medication prescription was renewed.

On July 13, 2012, Mr. Dausch accessed the sick call, requesting a front cuff pass. He stated, "It's tore again" <rotator cuff>. When asked how he knew, he replied, "Cause it's my shoulder." He was advised that he would have a formal shoulder evaluation referral. On examination, Mr. Dausch was able to "raise arm to shoulder height without difficulty or grimace." The provider (Tollick) then noted Mr. Dausch had been seen just 2 days prior for the same complaint. The front cuff pass request was forwarded to Dr. Espino for review.

On July 16, 2012, Dr. Espino reviewed the available charted records and denied the front cuff request. The denial was reasonable and was not a deviation from any clinical standard of care.

On July 27, 2012, Mr. Dausch was seen for the "Fracture/Dislocation/Sprain protocol" (FDS). His complaint again was right shoulder pain. Mr. Dausch reported

5

prior surgery in 2008, with placement of rods and pins in his right shoulder, and, "I think the tendons broke." He was noted to have limited range of motion in his right shoulder. Ibuprofen was administered.

On August 16, 2012, Mr. Dausch was seen again by the FDS clinic. He reported "extreme pain to R shoulder." He again reported prior surgery in 2008. He complained, "the black box has caused new damage" (referring to the black lock boxes attached to his handcuffs). He also now claimed "shoulder will dislocate throughout the day." He was given more ibuprofen and referred to the MD.

On August 22, 2012, Dr. Lagman evaluated Mr. Dausch. He reported 3 weeks of pain, "Feels like screws tearing away. Dislocates often with as much as lifting a food tray. Hard to sleep." There was no dislocation noted to be present at this encounter. He was given a prescription for Excedrin. A requisition for a right shoulder x-ray was submitted and approved. The images were read as, "There are surgical sutures in the humeral head. No fracture of significant osseous lesion is identified." This indicated no hardware was present (including screws), just residual surgical sutures. There was no evidence of a dislocation or any other active or acute process.

On September 10, 2012, Dr. Espino reviewed the charted records again to determine eligibility for a front cuff pass. He noted the more recent evaluation by Dr. Lagman, and scheduled Mr. Dausch for another in-person evaluation in the clinic to determine the need for this pass.

On September 24, 2012, Mr. Dausch was seen again in the FDS clinic. He again complained of extreme right shoulder pain. Because Mr. Dausch did not feel ibuprofen

6

was effective, the nurse noted "no treatment required at this time." He was given reasonable and appropriate advice to "limit activity until symptoms improve."

On September 28, 2012, Mr. Dausch was seen again in the FDS clinic. He reported ongoing right shoulder pain from "being cuffed behind the back with black box." The normal shoulder x-ray from August was reviewed. He was again advised to limit activity involving his right shoulder.

On October 3, 2012, Mr. Dausch was seen again in the FDS clinic. He now was reporting left shoulder, arm, and upper chest pain. He indicated that ibuprofen was not effective for pain relief. LPN Bell referred him to the medical clinic for additional review.

On October 17, 2012, Dr. Lagman evaluated Mr. Dausch. Mr. Dausch reported that he wanted an MRI and that his right shoulder was "destroyed" by the back-cuffs. The normal x-ray from August was again reviewed, and Dr. Lagman felt an MRI was not indicated. He also noted Mr. Dausch complained of the same pain with and without the cuffs, and denied the front cuff pass.

Dr. Espino evaluated Mr. Dausch on December 17, 2012 in the chronic care clinic for hypertension. Mr. Dausch's blood pressure at this visit was 142/83. He was already prescribed three blood pressure medications, and the documented plan was to continue these meds. There were no complaints about shoulder or biceps pain at this encounter. This management was reasonable and did not deviate from any standard of care.

The next documented clinic note indicating concerns about shoulder or arm pain was dated June 5, 2013 (nearly six months later). Dr. Rodriguez evaluated him. Mr. Dausch was advised to lose weight.

7

Mr. Dausch was reevaluated for his chronic shoulder pain on July 3, 2013. He noted, "I have chronic shoulder pain. Mobic works for me." At that time, he had not been taking any pain medication for at least 2 months. ARNP Faubion noted a prior right shoulder surgery in 2008. Ibuprofen was added, and a nonformulary request for Mobic was placed.

On October 2, 2013, Dr. Espino evaluated Mr. Dausch. The complaint was "possible L bicep muscle separation." Dr. Espino noted that Mr. Dausch had been doing pushups and had the sudden onset of pain in his mid left arm. There was a visible deformity over his left bicep. Dr. Espino correctly assessed this as a ruptured left biceps tendon, and submitted his diagnosis, examination and recommendation to utilization management. He also prescribed an ace-wrap to his arm, a toradol injection, and additional ibuprofen. This care was immediate, reasonable, appropriate, and did not deviate in any way from any standard of care for such an injury. It is relevant to note that this type of injury does not require an emergent transfer to an outside hospital or emergent surgical evaluation by an orthopedic surgeon. There was no evidence of any deliberate indifference or any deviation from any standard of care to Mr. Dausch's injury by. Dr. Espino.

On October 3, 2013, SLPN Enochs noted that Mr. Dausch was, "On the yard when my arm…I heard a pop. Was doing pushups." On examination, his left bicep was clearly deformed and was tender to touch. Despite having had multiple prior FDS clinic visits with instructions to limit activity, Mr. Dausch apparently disregarded the prescribed recommendations, leading to this injury.

8

On October 9, 2013, Dr. Espino re-evaluated Mr. Dausch while awaiting an administrative response to his request for an orthopedic specialty evaluation. Mr. Dausch again complained of pain. It was clear Dr. Espino was not indifferent to Mr. Dausch's recent tendon injury, and was attempting to provide appropriate care .

On October 14, 2013, a response was received to Dr. Espino's recommendation noting, "ATP: Biceps tendon rupture untreated provides 80% of so of original strength. Medically, surgery is not indicated. REC symptomatic care." In no way was this response an indication that Dr. Espino denied or otherwise was indifferent to Mr. Dausch's injury to his left biceps tendon.

On October 15, 2013, Dr. Espino approved a non-formulary drug request for "Lortab" in an attempt to procure what he believed might be more effective pain medication that what was available on formulary. Dr. Espino approved a "front-cuff" pass from October 9 through December 9, 2013. Dr. Espino noted, "…Will try to keep IM comfortable with the strongest NSAID in our formulary."

On October 16, 2013, Dr. Espino evaluated Mr. Dausch again. At this encounter, he notified Mr. Dausch that Utilization Management recommended conservative management for his symptoms. He was advised he would continue with the front cuff pass, pain medication, ace wraps, and would be seen in follow up again in approximately 2 weeks. This care did not demonstrate any deliberate indifference or deviation of from any standard of care by Dr. Espino.

On November 6, 2013, Dr. Espino evaluated Mr. Dausch again. He documented that Mr. Dausch was noting increasing numbness of *both* upper extremities (which was not consistent with a left biceps tendon injury, and was despite having a front cuff pass).

9

Mr. Dausch also complained of decreased range of motion (flexion and extension) of his left arm. These findings were confirmed on physical examination. Dr. Espino appropriately referred Mr. Dausch to physical therapy. This care did not demonstrate any deliberate indifference or deviation of from any standard of care by Dr. Espino.

On January 29, 2014, Mr. Dausch was evaluated by the physical therapy service. They prescribed therapy sessions twice weekly for four weeks. The charted documentation indicated, "Denies any injury or discomfort." This was supportive of the Corizon utilization management's initial response to Dr. Espino's request for an orthopedic consultation.

Throughout February and March 2013, Mr. Dausch continued with physical therapy as prescribed. On March 14, 2014, the physical therapist noted, "The left shoulder feels like a toothache that needs to be extracted, but the right shoulder seems to be responding to the PT well….I/M continues with discomfort in the left upper extremity but range of motion and strength has improved." As these were the goals of the prescribed physical therapy, and they had been met, the physical therapist referred Mr. Dausch back to the primary medical service for ongoing assessment and care.

On April 2, 2014, Mr. Dausch submitted a request for a renewal of his front cuff pass. Dr. Espino reviewed the charted records, and denied the front cuff pass. "Can not allow front cuff pass for security reasons." In my opinion, based on his documented improvement and response to the physical therapy, this denial was not deliberately indifferent or a deviation from the standard of care with regard to Mr. Dausch's medical issues. There had been no evidence that cuffing him behind his back had caused any of his injuries previously. Following this review, Dr. Espino had no further involvement in

10

Mr. Dausch's care until his transfer to the Indiana Department of Corrections in July 2014.

Review of the available MAR (medication administration record) and prescription records reveals Mr. Dausch received oral pain medication including Mobic, Excedrin, aspirin, toradol, and ibuprofen more or less throughout his time in the Florida Department of Corrections.

At the time of his transfer to the Indiana Department of Corrections, he was prescribed aspirin, milk of magnesia, lisinopril, Norvasc and hydrochlorothiazide.

SUMMARY

Mr. Dausch was a 58 year-old male in the Florida Department of Corrections from approximately June 2012 until July 2014. He had a known prior history of bilateral shoulder problems including rotator cuff tears and past surgeries. He had ongoing chronic pain with both shoulders for years prior to coming to the Florida prison system.

Mr. Dausch claimed that "black box" cuffing caused injury to one or both shoulders. This injury claim was not found to have been caused by black box cuffing by any medical personnel. He was prescribed pain medications and given reasonable advice to avoid vigorous physical exertion. He ignored these recommendations, and ultimately suffered a left biceps tendon rupture on October 2, 2013.

Dr. Espino saw him the same day. Dr. Espino prescribed and administered medications and provided an ace wrap to Mr. Dausch. He assessed a ruptured left biceps tendon and submitted his recommendation to utilization management who further recommended conservative management.

Dr. Espino referred Mr. Dausch for physical therapy as part of his conservative management plan. Mr. Dausch participated in and completed the recommended therapy, with acceptable improvement as per the physical therapist.

Dr. Espino essentially had no further direct involvement in the care of Mr. Dausch after that.

I saw no evidence of any deliberate indifference or deviation from any standard of care by Dr. Espino at any time during Mr. Dausch's incarceration in the Florida Department of Corrections.

I reserve the right to amend this document should additional records or information be made available for my review.

*[signature]*

Chad Zawitz, MD